Good afternoon, Your Honors. Carolyn Wiggin from the Federal Defender's Office for Mr. Lajocies. And I'd like to reserve two minutes for rebuttal, if I could. Yes, you may try to keep track of your own time. I'll try to remember, but it's your responsibility. Thank you, Your Honor. I'd like to start by discussing the cases in the 28-J letter that was submitted by Mr. Stegman last week, because I didn't have a chance to address those in my brief. And I think each of them is distinguishable from the case before you today. In Payne v. City of Lompoc, we have a situation in which the police actually witness a fight going on as they approach the scene. And then, even more significantly, as they approach this crowd and the two men that are fighting, they see the defendant rapidly walking away from them, and then he bursts into a run. And in Illinois v. Wardlaw in 2000, the U.S. Supreme Court said, unprovoked flight from the police can itself be a basis for reasonable suspicion. So I think that distinguishes the Payne case. The other thing in Payne is that the police had not detained or found the other person who was involved in the fight. And so, unlike in our case where the other person involved in the fight was sitting in a police car,  there was no real reason for the police to fear that my client, Mr. Lajoses, and Mr. Lamara, were going to be able to find each other again and begin fighting again. In the Payne v. City of Lompoc case, whoever the opponent was of Mr. Payne was out somewhere. The police didn't know where he was. The next case in the 20HA letter is City of Devils Lake v. Lawrence. And this is a case where— Let me ask you, didn't they have a reason to at least question him about what had happened? There was clearly an incident with a fight in the bar. I think that it was perfectly appropriate for the sheriff's deputies to go into the bar and ask him if he — first of all, ask if he would consent to go outside and talk to them. They could have questioned him in the bar. They could have definitely questioned him in the bar. And if they had a right to question him, is there something improper about saying, let's have this questioning in private? Could they have moved him to a table in the back of the bar where there weren't other people around? Well, I think that I would analyze that probably the same way as I would what they did do, which is force him to leave the bar. You say force. He was asked to leave, and whether he consented or not, he acquiesced and went outside. There was no physical force or threat involved, no guns pointed by law enforcement, were there? No guns pointed. There were four deputies in the bar. The testimony of three witnesses is that he was asked three times to leave. The first two times he said, no, I don't want to. They come, they ask him again, no, I don't want to. And the third time he finally said, figuring to himself he had no choice. Well, the district court found he didn't consent. Correct. But that they had reasonable suspicion to ask him to come along and ask him the questions. It was perfectly appropriate to ask him if he would voluntarily talk to them. But are they required to talk to him in the middle of a bar rather than going, stepping a few feet away outside where they could talk to him alone? Well, certainly if he consented to going outside the bar. No, no, not consented. We're assuming he didn't consent. Right. Assuming he didn't consent, if he was unwilling to leave the bar. I just said to him, please come with us. We gave him an instruction to come so they could talk to him in private. I'm not sure if Your Honor is asking me about whether, are we conceding that wouldn't be consent? I don't know if the question goes to consent. I'm not talking about consent. I'm asking whether there would be something wrong with violation of the Fourth Amendment for the officers who have reason to question somebody who's sitting at a bar, at sort of a rockish area, a place, to say to him, we'd like to ask you these questions in a quiet place in private. Please come with us. And not that he consents. He doesn't want to, but he's instructed to. Is that a Fourth Amendment violation? That is a seizure. I think it's a Terry stop to ask him to leave the bar with them. A noisy bar with people with pool cues, loud music, and lots of drinking going on. There's something wrong with the law enforcement saying, let's go outside. There's nothing wrong with it, but I believe it is a seizure. Let's talk about what happens when they get outside. He does go outside, whether by consent or compulsion or acquiescence, however you want to characterize it. Is it legitimate for law enforcement to take into consideration the nature of the person they're confronting in connection with a possible Terry frisk? In other words, if it's a priest as opposed to a Hell's Angel member in full regalia? Which one would you choose? Good question. It's part of the totality of circumstances they can consider. And this brings me to something I did want to highlight in this argument. Let me ask you one other question before you get into that. Several of the officers said that immediately or shortly before, sometime before the actual Terry frisk occurred, that your client reached inside his vest. Does he dispute that? No, but he was reaching for his ID. And how are they to know that as opposed to reaching for a weapon? Well, the testimony is that he was asked for his identification. And so I don't believe there's a dispute that he – that people thought he was reaching for a weapon at that point. There's no dispute he was asked for identification. Did he reach in response to the request? Yes, he did. If you read Deputy Press's testimony, he said, I asked him for his identification. He was reaching for it. And then Sergeant Dunsing realizes he knows this person, has another question, and then asks to do the pat-down. But the point that I want to come back to is, if you read Deputy Press's testimony on page 34, he says that while they're inside the bar, he does not feel the need to do a pat-down. He does not feel threatened by Mr. Legosi's. It's only once he's removed him from the bar. And at this point, they've interacted. Inside the bar, did he know that he was a Hells Angel? They never actually asked him if he was a Hells Angel. But inside the bar, he can see the vest. And that's the whole reason he focuses in on this person, is that he's wearing a vest with a Hells Angel insignia. So, look, Deputy Press says, while we're inside the bar, I feel no need to pat him down. I'm not worried about him. But then, after they've interacted with him for a while, he's been calm. They don't think he's drunk. He's gone outside with them. He's now surrounded by four or five deputies. There's a little variation in the testimony on that. It's only at that point that they say, we feel the need to pat him down. You have a minute and a half. We'll give you your two minutes, but I'd like you to answer one question. Sure. How do you get around the factual finding that he consented to the frisk? Well, I think it's the ---- Would we have to find it clearly erroneous? The ---- I think that the legal ---- there's some questions of fact. Certainly, I don't think it was clear error for Judge Levy to have found that he raised his arms. And that's not what I'm arguing. In response to the question, you know, could we search you or whatever, frisk, there was a question that Judge Levy said caused him to raise his arms. Correct. Which he then took to be acquiescence. Right. I think the conclusion that there was consent is a legal conclusion that you review DeNovo. And while it's ---- I don't dispute that he raised his arms. My argument is that under Supreme Court case law saying that when you acquiesce to a show of authority, that's not consent. Okay. So you're ---- He had no ---- You're not disputing the facts then, although his ---- under his version, there would not have been any acquiescence. He says I ---- he says that he said, why do I ---- I don't want to do this. Am I under arrest? And then he only raised his arms 30 degrees. I think the government witnesses say he mumbled something and raised his arms 90 degrees. My argument doesn't really depend on which of those ---- So you're accepting the fact that he raised the arms and ---- Yes. And you're just saying that the ---- The response ---- Your argument that the reason it's not consent is solely that there were four sheriffs surrounding him. Right. They had just three times or twice he had tried to object to going outside, finally felt I'm forced to go outside. Now they're all surrounding him, telling him, you know, raise your arms, we're doing a pat-down search. He didn't feel that he had a choice. That's where the lack of consent is. Thank you. Thank you. May it please the Court, Matthew Stegman for the United States. When a police officer comes upon the aftermath of a fight, the police officer has to be able to detain the combatants, those involved in the fight, even if the police officer didn't see the fight. If a police officer comes upon what was clearly a fight, either a 911 call that there's a fight in progress, by the time the officer gets there, the fight's over, but they see the bloody face, the torn shirt, or they drive up to the scene, and they see the aftermath of a fight such as this case, the police have to be able to maintain the status quo, detain the combatants, and find out what's going on. One of the combatants may want to press charges against the other, may want to make a citizen's arrest. Can I stop you there? I'm sorry? Can I stop you there? Yes. Did the non-Hells Angel participant in the prior altercation indicate that he wanted to press charges? Not in this case. Was he detained? I'm sorry? Was he detained? He was detained so that the police could maintain the status quo, talk to the people involved, and find out what's going on. What happened to him, the one, the non-Hells Angel? Your Honor, that's a good question. I don't have an answer to that. That's not in the record. Well, I'm interested. What crime did the police think he had been committed? When they came up to the scene, they saw Lamar's face was bloody. They saw, or scratched. They saw red, I believe. The shirt was torn. What's the other man, who's, I understand, was, used crutches to get around, right? Correct. And he says that this drunk bothered me. Now, there's no crime in fending off a drunk, is there? If that's what happened. But when the police But do they have any other explanation? They don't have any explanation yet. They do not know what happened at this point. What do they think happened if they approached the man who participated? He says, I just got rid of this drunk. So what other theory do they have to go on? They don't yet know who threw the first blow. Well, the other man doesn't accuse him, does he? The other man hasn't said. No one has said yet. There's very, very little to go on. That's the problem. That's why the police. Problem for the police. Exactly. No, the problem, they have nothing, no basis for suspicion. I understand. The court's saying that there was no reasonable suspicion at that point. I think it's too soon for the police officer. As you get the facts to start with, they come up and they find two people outside, one of whom is the one who had the face problem. His friend tells him that the guy is drunk, the guy who's got the problem, the face thing. He'd been drunk and talking smack to a Hell's Angel member inside. And then there was a brief altercation. He took him outside. The police then take the drunk and put the drunk in the police car. Right. Nobody had said to them that the person inside was drunk or disorderly or had done anything wrong except other than fend off the drunk, as judge said. Actually, what the information the police had at that point was that the Hell's Angel at the bar had been involved in a fight, and that... Well, no, involved, you're looking... Involved, if a drunk attacks you and you fend him off, you're involved in it, but you're not an aggressor. Right. That assumes that the drunk attacked him, and that wasn't the information the police had. All the police knew at the time was that the drunk was talking smack, and talking smack is not a crime. And if the Hell's Angel, upon further investigation, it was determined that the Hell's Angel had taken the first punch and punched the Mara in response to the talking smack, then the Hell's Angel would have been guilty of a battery. Isn't it correct that when they located Mr. LaJosace, the Hell's Angel member inside the bar, that one of the first things he said was, I don't want to make a beef out of this, the guy was drunk, it's not that big of something like that? That's correct. One of the very first things he said, which suggests to me that what the officers' questions in as part of their questioning, they assumed that the drunk was the aggressor. I don't think they assumed that. Why else would the guy say, look, I don't want to make a beef out of this, the guy was probably drunk, and it's over with, it's done, I want to eat my cheeseburger. The Hell's Angel may have, or Mr. LaJosace in this case, may have thrown the first punch, and he just wanted the police to go away. Besides, the Hell's Angel is the guy who was drunk. How would that exchange occur unless in their questions the law enforcement personnel assumed that the drunk that they had in custody was the initiator of the violence? Actually, I think what happened was the deputies approached Mr. LaJosace and asked to talk to him, and he responded by saying, I don't want to talk, and I don't want to do anything about this. But they yet did not have a statement from Mr. LaJosace. They didn't yet have a chance to talk to him. They needed to take him outside to a safe, quiet place where they could talk to him. If they had a basis for suspicion. But now. Well, go ahead. Okay. It's undisputed that when the police arrived that they didn't know who threw the first punch. They didn't know who committed a battery or who committed a 415 fighting in public. They needed to find out. They didn't know Mr. LaJosace's name. They didn't know who he was. All they wanted to do was briefly detain him and take him outside and find out his name and what happened. Why didn't they ask Mr. Bennett, who told them this guy's a drunk, he's my friend, you know, he got into a beef inside? Why didn't they ask Mr. Bennett, did your friend start the fight? Actually, they did. And Mr. Bennett was in the bathroom at the time and didn't see the fight start. So they needed to go further. Mr. LaJosace had not been a hell's angel. Would they have done this? I believe they would have. I think that the police and the police need to do their job. They need to go in and find out what's going on. They wouldn't have fisked him, would they? I think they'd very likely have asked him the question, but why would they have fisked him? Because when he came outside, he had just been involved in a fight. He was reaching his vest. And by the way, tell us about the reaching. I'm sorry? Tell us about the reaching. I just reviewed the transcript because my recollection is that they didn't ask him for a card, ID card. All they did was ask him his name. When Sergeant Dunsing recognized that he had previously used a different name, he had now, he'd been involved in a fight. He comes outside. He's giving either this time a false name or previously a false name. At least there is reasonable suspicion that he's using a false name. And then he reaches into his pocket. At that point, I think the officers, whoever they're dealing with, Hells Angel or not, are going to ask, do you mind if we frisk you? And you add to that the fact that the police understand that Hells Angels at this time are carrying weapons, guns, because of the recent Laughlin shootout and the fights with the Mongols. And so the totality of the circumstances is such that the police are concerned that they're going to get shot. And they just want to do a quick pat down to make sure that the person they're dealing with is safe. Is not armed. And I'd like to point out in the two cases cited by the defense for the proposition that police cannot investigate a prior misdemeanor. The first case is United States versus Jigeti, if I'm pronouncing that correctly. That's a District of Maryland case where the police get an anonymous call of indecent exposure in a taxi cab. And the court in that case says that this was a crime that had occurred prior, that the police had no personal knowledge of the information. And even in that case, they said they made exceptions where crimes, where public safety was an issue, such as in this case, where the crime may continue, such as this case, or where the police need to identify the perpetrator or the possible perpetrator, as in this case. State v. Holmes was a case where a car was being towed, a violation was issued, and the court said, in that case, the violation was already being enforced. There was no reason to detain the driver. And in the 28-J letter that I submitted, I set forth the Payne versus City of Lompoc case. Very similar to this case, the police arrived to see a crowd of people. They didn't see the fight, and they see people running. They didn't see the fight. And the Ninth Circuit, this court, said in that case that the policeman had articulable facts supporting a reasonable suspicion that Payne had been involved in a fight. And that was the reason, reasonable suspicion to detain. And in City of Devil's Lake versus Lawrence, that's a North Dakota Supreme Court case. The police get a call of a fight. By the time they get there, the fight's done, one of the combatants is leaving. And the North Dakota Supreme Court says that there was reasonable suspicion to detain. Sets forth a number of, one Eighth Circuit case, I believe, and a number of state cases across the country that so hold that the police, after arriving to the aftermath of a fight, can detain briefly to find out what's going on, to maintain the status quo. That's all we want, is for the police to be able to maintain the status quo briefly, find out what's going on, so that they can either arrest if one of the parties wants an arrest, or they could submit the reports to the district attorney's office for a possible arrest warrant and criminal complaint. Is there an inconsistency between the statement of the officers when the first officer, Mr. Press, testified that, as I was writing down, I don't know where it is, he asked, we then, I began to ask him for his name and date of birth and his proper identification, so that I could properly identify who he was. They did ask him for his identification. I suppose that could be read as asking for an ID card for which you're reaching his name and date of birth and proper identification. What would that mean, except asking him to produce some identification? I think it would be an ID card. When counsel was addressing the Court, she mentioned Sergeant Dunsing's testimony. I went to Sergeant Dunsing's testimony, read that, and he doesn't talk about an ID card. No. So I agree. But nonetheless, he's reaching into his pocket after giving what very likely was a false name, after being involved in a fight, wearing full Hells Angels colors. I think the police had reasonable suspicion, and all they wanted to do was do a quick pat down. Would it be enough for reasonable suspicion that he was a Hells Angel? If the police suspect him of committing some sort of crime, and they're stopping a monetary stop, and they know that the Hells Angels from that very community were involved in a shootout, and the president of that very Hells Angels chapter had been killed, and they understand that the Hells Angels in that area are carrying guns, I think that the police would have a reasonable suspicion to pat him down. That and only that. That, well, that and the fact that the, depending on what kind of crime the defendant had been stopped in regards to, but if it was some sort of a violent crime, such as fighting, I think so. In this case, we also have the defendant reaching into his coat and giving, or his vest, and giving a possible false name. What was it exactly that they were told about Hells Angels carrying guns? The, they were told in a, the deputies in this case, and the sergeant, had read off of a flyer in their briefing at the police department that there had four months before been a shootout between the Hells Angels and the Mongols, and that because of that, the Hells Angels and the Mongols were carrying weapons for self-defense and possible retaliation. In addition to that, the, one of the deputies testified that he was told, I believe it was Deputy Press, the district attorney or deputy district attorney from that area had been briefing the police and had also given them that information. All right. Thank you. Thank you. Thank you. Thank you. I will just briefly make a few last comments. One thing I just want to draw the Court's attention to in closing this argument is the basic rule of Terry that the police, because they don't have a search warrant, need to use the least intrusive means possible to conduct their investigation. And what Your Honor had asked about, couldn't they have talked more to Mr. Bennett? It's true Mr. Bennett might have not seen the beginning of the fight, but he could have answered questions such as, is Mr. Lamara in the Mongols? Did you see any weapons? What was the fight about? There was also a waitress from the bar who gave very detailed testimony about how many times Mr. Legosi was asked to leave. She presumably and other people in the bar presumably saw this fight. Any of them could have been asked about what was the nature of the fight, what actually happened. If we're using the least intrusive means to conduct investigation,  And then just to really briefly touch on the three cases in the 28J letter, I know we've Mr. Stegman and I have I don't think you need to worry about what the North Dakota Supreme Court has said. Okay. What other part of the 28J letter haven't you already commented on? The only other case that I haven't You talked about Payne, didn't you? Payne we've both talked about. In that one, I say the police saw the fight. Mr. Stegman says they didn't. I think they came up upon a crowd. There is language in that opinion that says the police officer said he saw what he thought was a fight. And he certainly saw the crowd. And more importantly, he saw Mr. Payne walking rapidly away and then running as the police approached. The final case, Eberl v. City of Anaheim, involved a rowdy football fan. And police actually saw him engaged in conduct that they said was disturbing the peace. And they had been warned by ushers, Hey, we think this person is doing something that could cause a fight to begin. So in that situation, they have reason to think a fight is imminent. And they're attempting to avoid that situation. What do you think about the government's argument that they had reason to search him because they had been briefed that Hells Angels were currently carrying weapons? Well, I think, I mean, one of the things that the government just said in argument is that it had to do with the fact that this was Stockton and one person had been killed from Stockton. Deputy Press said that he had determined he would pat down a Hells Angel no matter where they were from. They could be visiting from France, and if he saw them, he would pat them down. So I think that the incident in Laughlin had happened several months earlier, many miles away. You know, certainly there could have been circumstances like, let's say, Mr. Lamara had been in a gang that had a beef with the Hells Angels, or there was any reason to think this had to do with... The question is, did the officers, were they informed by their superiors that the Hells Angels were carrying weapons? I have no doubt that that briefing happened where they speculated that they might be. And if you're questioning someone that you believe is carrying a weapon, do you have reason to believe he's carrying a weapon? Is that not a reason to frisk him? You have to believe he's armed and dangerous. And in this case, Mr. Legosi clearly didn't want to be bothered by the police, but he hadn't done anything violent or aggressive toward them. There was no evidence that this fight involved weapons. And it just makes no sense that inside the bar they didn't feel the need to pat him down, but suddenly when they get outside the bar, this fear arises. I think that, you know, perhaps they thought they could find a weapon on him, but I don't think they can't use a Terry stop to look for evidence. They can only do the pat down and a Terry stop if they believe the person is armed and dangerous at that time. And I don't think they had a basis for that in this case. Thank you. Unless the Court has any... Thank you. The case just argued will be submitted.
judges: Reinhardt, Noonan, Hawkins